## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 1:21-cr-00047-RDM** |
| v. | : | |
| | : | |
| HECTOR VARGAS SANTOS, | : | |
| | : | |
| Defendant | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Vargas unlawfully entered the Capitol during the midst of a deadly riot on January, 6, 2021. For the reasons set forth herein, the government requests that this Court sentence Defendant Hector Vargas Santos ("Vargas") to 21 months' incarceration, 12 months' supervised release, a fine of $2,150, and restitution of $500.

### I.      Introduction

Vargas is 29 years old and currently works as a truck driver. On January 6, 2021, Vargas participated in the attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.

A jury convicted Vargas of violating 18 U.S.C. § 1752(a)(1): entering and remaining in a restricted building; 18 U.S.C. § 1752(a)(2): disorderly and disruptive conduct in a restricted building; 40 U.S.C. § 5104(e)(2)(D): disorderly and disruptive conduct in a Capitol building; and 40 U.S.C. § 5104(e)(2)(G): parading, picketing, and demonstrating in a Capitol building.

1

The Court must also consider that Vargas's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers, who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of Vargas's crimes support a sentence of 21 months incarceration in this case.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 1 Attachment 1 (Statement of Facts). As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day.

### Defendant Vargas's Role in the January 6, 2021 Attack on the Capitol

The evidence admitted at trial showed that, on January 6, 2021, Vargas climbed over the restricted area perimeter fencing shortly after the breach at the Peace Circle and ran across the grass field on the west side of the Capitol.



**Government Exhibit 401**

2

By approximately 12:57 p.m., Vargas was near a gate that blocked entry to the West Plaza of the Capitol building. Approximately one minute later, Vargas opened the gate, enabling himself and other rioters to move closer to the building.



**Government Exhibit 102**



**Government Exhibit 403**

The evidence further showed that while on the West Plaza, Vargas climbed a nearby wall on the southwest scaffolding, through a cloud of chemical irritants, waved a yellow Gadsden flag, and waved his arm to encourage the crowd. The chants of the crowd grew in response.



**Government Exhibit 404**

Shortly thereafter, the crowd below Vargas engaged in hand-to-hand violence with the police line. Simultaneously, Vargas was confronted on the wall by a police officer, as he tried to assist another rioter in climbing the wall.



**Government Exhibit 508**

4

After a police officer confronted Vargas on the wall, Vargas rejoined the crowd below, near the police line, where another violent clash between the rioters and police occurred. Vargas was again near a cloud of chemical irritants and comes close to several officers in riot gear.



**Government Exhibit 413**

Vargas then moved through the crowd to the northwest lawn and went around the building to the East Front of the Capitol. The evidence showed that at approximately 2:50 p.m., while he was on the East Front, Vargas messaged someone on Facebook and stated "We're about to go in." *See* Government Exhibit 701.

The evidence further showed that at approximately 3:15 p.m., Vargas was blocked from entering the East Rotunda doors by U.S. Capitol Police Officers, and after this, he remained near the East Rotunda doors for over 5 minutes while several other rioters exited the Capitol and moved away from the East Rotunda doors.



**Government Exhibit 103**

At approximately 3:20 p.m., Vargas placed his hands and forearm on one of those same doors, and maneuvered his body around the door, and into the entryway, as the crowd overpowered the U.S. Capitol Police Officers there. As Vargas advanced through the foyer beyond the East Rotunda doors, towards the Rotunda entrance, a densely packed police line in riot gear guarded the Rotunda entrance. Metropolitan Police Officer Lee Lepe testified that the officers there were attempting to keep rioters from entering the Rotunda, but that rioters kept pushing against the police line.



**Government Exhibit 415**

The surveillance video in Government Exhibit 104 shows Vargas with other rioters close to the Metropolitan Police line guarding the Rotunda. This video also shows the density of the line of officers and shows the crowd swaying. At approximately 3:23:25, Vargas's hat is visible up against the line as he appears to push into the other rioters and officers in front of him. Surveillance video in Government Exhibit 105 shows an overhead view inside the Rotunda and demonstrates how densely packed with police the area was around the door that Vargas entered.



**Government Exhibit 105**



**Government Exhibit 104**

Body worn camera footage in Government Exhibit 307 at approximately 3:22:44 p.m.

provides a good example of the density of the police line and the pressure that the crowd –

including Vargas – placed on that police line.



**Government Exhibit 307**

By approximately 3:24 p.m., Vargas made his way through the dense police line and into the Rotunda. Vargas is seen on body worn camera, moving further into the Rotunda, pressing his body into other rioters, and coming into contact with police officers. Body worn camera in Government Exhibit 302 shows the officers struggling with an advancing crowd from which Vargas emerges, within the police line itself, albeit with his hands raised, but with his body moving forward into the officers there.



**Government Exhibit 302**

Body worn camera footage in Government Exhibit 305 shows officers struggling with the crowd entering the Rotunda. At approximately 3:24:25, Vargas is recorded pressing his back into another rioter whom police are trying to control.



**Government Exhibit 305**

Metropolitan Police Officer Lee Lepe's body worn camera footage in Government Exhibit 306 shows multiple officers, including Officer Lepe, holding onto Vargas's clothing and tactical vest. During this encounter, Officer Lepe ordered Vargas to get on the ground. Vargas ignored this command, and instead, after Officer Lepe freed his grip on him, went off to the side and recorded a "selfie" video of himself exclaiming that "we took over this motherfucker, we took over this Capitol." Shortly thereafter, Vargas and other rioters inside the Rotunda were escorted out of the Memorial Doorway. Vargas then let out a loud cheer and posted the video from the Rotunda to Facebook.

*Social Media Posts*

The government also presented evidence of Vargas's state of mind before, during, and after January 6 in Government Exhibits 701 and 702. In the days leading up to January 6, 2021, Vargas posted statements about his intent in traveling to Washington D.C. Vargas made statements that he did not intend to participate in peaceful protest. On January 4, 2021, he wrote on Instagram "Some of this [sic] people here only going to DC to take pics and videos and say they're real

patriots but wont do shit that involves taking real action cause they're 'pEaCeful.'" On January 5, 2021 he wrote, "Time to rise but the peaceful shit that aint taking is [sic] nowhere," and "I don't wanna go to DC again or another peaceful protest." Vargas further tried to organize a group to paint over a "Black Lives Matter" mural on Pennsylvania Avenue.

Vargas encouraged others in online chats to brings guns to Washington, D.C. on January 6. In one thread from January 5, 2021, Vargas said, "Organize. Get groups of 100 people. They're not gonna arrest groups of people with guns. Enrique Tarrio banned from DC cause we let them and again this shit got us nowhere." In response to an unknown message in the thread, Vargas wrote "Lol okay so complain with them, Don't bring guns to DC guys. I still got mine but I'm not gonna brandish no one and wave it around like here guys I got a gun on me." Vargas then sent a photo in the thread that appeared to show a hand holding a pistol. In another thread on January 4, 2021, Vargas stated "of course we'll setup a GoFundMe and we'll help you or anyone who gets into legal issues for practicing their 2nd amendment [sic] right in DC. If we come as a group of armed people collectively we won't get arrested. So bring it in. time to stop being scared, if you're a legal gun owner then bring it with u." Social media evidence also showed that Vargas attempted to join the Proud Boys prior to January 6, 2021.

On the morning of January 6, 2021, Vargas sent a message on Instagram stating that the "fake fraudulent election . . . could result in the beginning of the next american [sic] civil war and revolution." During the events of January 6, 2021, Vargas messaged someone on Instagram stating, "Remember this day so u [sic] can tell ur [sic] grandkids." On January 8, 2021, he bragged on Instagram "When trump said let's go to Capitol I was the first guy to bust down the capitol fence down and rushing to the capitol didn't see none of them. We got pepper sprayed, shot with paintballs, and flashbangs. They were nowhere to be found cause remember 'pictures' and videos."

As noted in the PSR, Vargas maintains a "GiveSendGo" donations page. In addition to raising $2,150, Vargas expressed a lack of remorse in the characterization of his conduct. PSR at 12-13.

*Vargas' Trial Testimony*

Vargas testified during trial and made several false and misleading statements.

• Vargas testified that he wore his tactical vest over his jacket because of the cold; however, earlier in Vargas's testimony he presented photographs of himself wearing the tactical vest at "Black Lives Matter" protests in the summer of 2020.

• Vargas attempted to give the jury the impression that he was a peaceful community activist, who attended a lot of political and social rallies. Vargas introduced photographs of himself attending "Black Lives Matter" protests. During his testimony, Vargas stated he attended those rallies to protest police brutality and the death of George Floyd. However, in its rebuttal case, the government introduced numerous social media messages in which Vargas expressed his disdain for "Black Lives Matter" and in which he even hatched a plan to paint over the Black Lives Matter mural on Pennsylvania Avenue.

• Vargas testified that after Officer Michael Hallas stopped him in the entryway to the East Rotunda doors at approximately 3:15 p.m., he changed his mind and no longer desired to enter the building. However, the surveillance video in Government Exhibit 103 shows rioters streaming out of the Capitol and moving away from the East Rotunda doors for several minutes after Vargas first attempted to enter. Vargas did not follow this crowd away from the East Rotunda doors. Instead, Vargas remained near the entryway, off to one side for several minutes until the crowd gained momentum at 3:20 p.m. Vargas used his hands and forearms to maneuver around, and press open, the East Rotunda door. He continued moving forward through the crowd and into the Rotunda. Vargas testified that the hand and arm movement demonstrated him trying to hold onto the door to prevent himself from being pushed into the building with the crowd, but the video evidence introduced at trial and discussed above showed him briefly holding onto the door as he maneuvered his body into the entryway. Vargas was not clinging to the door to prevent from being pushed into the building. Vargas' testimony is also in contrast to his stated intent. Vargas messaged another person on social media at approximately 2:50 p.m. and stated "we're about to go in."

• Vargas explained that he remained in the entryway of the Capitol for several minutes because of his great admiration for the Capitol and its architecture. However, the evidence showed that minutes later Vargas filmed himself in the Rotunda as he referred to the Capitol as a "motherfucker" he "took over."

• Vargas testified that he asked police for the way out of the Rotunda. This is not supported by any evidence despite numerous officers wearing body worn cameras at the time he entered.

*The Charges*

On January 14, 2021, the United States charged Vargas by criminal complaint with violating 18 U.S.C. § 1752(a)(1) entering and remaining in a restricted building; 18 U.S.C. § 1752(a)(2) disorderly and disruptive conduct in a restricted building; 40 U.S.C. § 5104(e)(2)(D) disorderly and disruptive conduct in a Capitol building; and 40 U.S.C. § 5104(e)(2)(G) parading, picketing, and demonstrating in a Capitol building.

On January 19, 2021, FBI agents arrested him at his home in New Jersey. On January 22, 2021, the United States charged Vargas by a four-count Information with the same charges. On December 12, 2022, after a four-day jury trial, Vargas was convicted of all four Counts on the Information.

### III.   Statutory Penalties

Vargas faces up to one year of imprisonment and a fine of up to $100,000 on each of the first two counts of the information: 18 U.S.C. § 1752(a)(1) entering and remaining in a restricted building and 18 U.S.C. § 1752(a)(2) disorderly and disruptive conduct in a restricted building. Vargas also faces an additional six months of imprisonment and a fine of up to $5,000 on each of the second two counts of the Information: 40 U.S.C. § 5104(e)(2)(D) disorderly and disruptive conduct in a Capitol building; and 40 U.S.C. § 5104(e)(2)(G) parading, picketing, and demonstrating in a Capitol building. Vargas may also be ordered to pay restitution.

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should

be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government disagrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Vargas's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Count 1 Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Trespass at Restricted Building (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Obstructing the Administration of Justice (U.S.S.G. §3C1.1(a)) | +2 |
| Total Adjusted offense Level | +8 |
| | |
| Count 2 Base Offense Level (U.S.S.G. §2A2.4) | +10 |
| Obstructing the Administration of Justice (U.S.S.G. §3C1.1(a)) | +2 |
| Total Adjusted Offense Level | +12 |
| | |
| Multiple Count Adjustment U.S.S.G. §3D1.4(a)-(c) | +2 |
| Combined Adjusted Offense level | +14 |

The government agrees with the base offense level for Count 1 and the specific offense characteristic enhancement detailed above and in the PSR. The government also believes that the PSR correctly applies the adjustment under U.S.S.G. § 3C1.1; however, no evidence was presented at trial regarding the deletion of Vargas's social media accounts. The government believes the basis for such an adjustment is because of Vargas's materially false and misleading testimony during trial.

The government agrees that the base offense level for Count 2 is 10. There is no applicable Chapter Two Guideline for this offense in the Statutory Appendix; therefore, "the most analogous

guideline" must be applied. U.S.S.G. §2X5.1.  Here, that is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers."

The government also agrees with the application of U.S.S.G. § 3C1.1 for Vargas's obstruction of justice; however, as noted above, the government believes the basis for such an adjustment is because of Vargas' materially false and misleading testimony during trial.

The government disagrees with paragraphs 36 and 40 of the PSR which does not apply any Specific Offense Characteristics for Count 2. An additional three points should be added to the adjusted offense level, because under U.S.S.G. §2A2.4(b)(1)(A), the offense involved physical contact with the dense line of police officers guarding the Rotunda entrance.

Under U.S.S.G. §3D1.2(a) and (c), "closely related counts" group.  Here, Counts One and Two should group because they involve the same harm and the same victim: Congress. U.S.S.G. §3D1.2(a). That group has an offense level of 15 because Count Two, which has the highest offense level of Counts One and Two, has an offense level 15. U.S.S.G. § 3D1.3(a). Therefore, the government submits that the offense level for Count One is 8 and Count Two is 15 as detailed below:

| | |
|---|---|
| Count 1 Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Trespass at Restricted Building (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Obstructing the Administration of Justice (U.S.S.G. §3C1.1(a)) | +2 |
| Total Adjusted Offense Level | +8 |
| | |
| Count 2 Base Offense Level (U.S.S.G. §2A2.4) | +10 |
| Offense Involved Physical Contact (U.S.S.G. §2A2.4(b)(1)(A)) | +3 |
| Obstructing the Administration of Justice (U.S.S.G. §3C1.1(a)) | +2 |
| Total Adjusted Offense Level | +15 |

Under U.S.S.G. §2J1.2, the combined offense level for the Group is the highest offense level, and thus, the Group's offense level is 15. The government agrees with the U.S. Probation Office's calculation of Vargas's criminal history as a category I. PSR at ¶ 50. Accordingly,

Vargas's total adjusted offense level and his corresponding Guidelines imprisonment range is 18-24 months. Where the Sentencing Guidelines range is higher than the statutory maximum for any one count, the Court may impose consecutive or partially consecutive sentences on more than one count to get a total sentence of confinement that's within the Sentencing Guidelines range. *See* U.S.S.G. §5G1.2(d).

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a term of incarceration within the properly calculated Sentencing Guidelines range.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Vargas's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Vargas, the absence of violent or destructive acts is not a mitigating factor. Had Vargas engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Vargas's case is that he traveled to Washington D.C. with the intent to participate in disorderly, disruptive, and perhaps even destructive and violent conduct. In several social media messages in the days leading up to January 6, 2021, Vargas made statements that he did not intend to participate in a peaceful protest. On January 4, 2021, he wrote "Some of this [sic] people here only going to DC to take pics and videos and say they're real patriots but wont do shit that involves taking real action cause they're 'pEaCeful.'" On January 5, 2021, he wrote, "Time to rise but the peaceful shit that aint taking is [sic] nowhere," and "I don't wanna go to DC again or another peaceful protest." Vargas further tried to organize a group to paint over a "Black Lives Matter" mural on Pennsylvania Avenue, something very likely to provoke a forceful and potentially violent response from persons who supported the Black Lives Matter movement. On the morning of January 6, 2021, he sent a message on Instagram stating that the "fake fraudulent election . . . could result in the beginning of the next american [sic] civil war and revolution." Vargas also talked about organizing large groups of armed individuals to prevent

the police from being able to arrest them for weapons offenses. He suggested he would carry his own concealed firearm during the events of January 6, 2021.

Vargas traveled from New Jersey to Washington, D.C. with a tactical vest and wore it throughout the day's events. This demonstrates Vargas' anticipation of violence. In the context of his other conduct on the West Front, the tactical vest was not worn as mere protection from unwarranted acts of violence by supposed counter-protesters, because as the evidence proved, Vargas was on the offensive, both on the West Front, and at the East Rotunda doors. Any protection he wore only served to protect him from law enforcement's riot control munitions. Also indicative of Vargas' intent for disruption, disorder, and violence, was his efforts to join the Proud Boys. In an online message, Vargas attempted to market himself to the Proud Boys by discussing his military experience and participation in other violent protests.

Another important factor is that Vargas participated in disorderly and disruptive conduct early and often on January 6 and encouraged other rioters' conduct along the way. Vargas was one of the first rioters to cross into the restricted Capitol grounds. Shortly after the breach at the Peace Circle, Vargas and several others began climbing over the snow fencing that blocked access to the West lawn. Once Vargas reached the gate that blocked access to the West Plaza, he opened the gate and allowed himself and other rioters to advance closer to the building. Vargas climbed a wall on the West Plaza and waived a yellow Gadsden flag and gestured with his other arm up and down, to encourage the rioters' chants and fighting nearby. After witnessing several acts of violence against police officers and being subjected to chemical irritants on the West Front, Vargas remained on the Capitol grounds for several hours before making his way to the East Rotunda doors and forcing his way into the building and Rotunda with a crowd of rioters. Once Vargas and

a small group of other rioters made it through the dense police line and inside the Rotunda, Vargas disregarded police commands to get on the ground.

As noted above, one of Vargas' most disturbing actions was his encouragement of others in online chats to brings guns to Washington, D.C. on January 6, 2021.

Another aggravating factor is Vargas' lack of remorse for any of his conduct. On Vargas's "GiveSendGo" page, he still describes the charges against him as "outrageous." Furthermore, Vargas tried to minimize and mischaracterize his conduct in false and misleading trial testimony.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of Vargas

As set forth in the PSR, Vargas was arrested in July, 2020 for domestic violence related charges. In January, 2022, those charges were dismissed, and therefore, Vargas does not have a criminal history.

Vargas reported to the PSR writer that he served in the Marine Corps from May, 2011 to May, 2015 and received an honorable discharge. PSR at ¶ 73. Vargas informed the PSR writer that he attained the rank of E-5 but was demoted to E-4 due to charges related to the theft of an iPhone. PSR at ¶ 73. Although Vargas has no combat deployments, he reports receiving service-connected disability for Post-Traumatic Stress Disorder. *See* PSR at ¶¶ 68, 73, 80.

Vargas reported currently working as a truck driver. PSR at ¶ 76.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United*

*States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Vargas has not taken any responsibility, nor shown any remorse, for his actions on January 6, 2021. During the events of January 6, 2021, Vargas messaged someone on Instagram stating, "Remember this day so u [sic] can tell ur [sic] grandkids." On January 8, 2021, he bragged on

Instagram "When trump said let's go to Capitol I was the first guy to bust down the capitol fence down and rushing to the capitol didn't see none of them. We got pepper sprayed, shot with paintballs, and flashbangs. They were nowhere to be found cause remember 'pictures' and videos."

As noted in the PSR, Vargas has also maintained a "GiveSendGo" donations page and has raised $2,150 as a result of his participation in the January 6, 2021 riot. PSR at ¶ 65. On the page, Vargas states the charges against him are for "exercising my first amendment right of protesting and for documenting the events that occurred at the DC Capitol on the 6th of January, 2021." PSR at ¶ 65. He goes on to say that "the charges against myself are beyond outrageous." PSR at ¶ 65.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[1] This Court must sentence Vargas based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-

---

[1]  Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); accord United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP),

Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The government has often recommended, and judges have imposed, periods of incarceration in cases where a misdemeanor defendant planned for participation in the riot, participated in key moments of the riot, encouraged others to participate in the violence, expressed no remorse, and/or gave false and misleading testimony at trial.

In *United States v. Russel Alford* 1:21-CR-00263 – TSC, the defendant was convicted of the same four misdemeanor offenses as Vargas after a jury trial. The Court sentenced the defendant to 12 months of incarceration, within the Sentencing Guidelines range in that case, 12 months of supervised release and $500.00 in restitution. In *Alford,* just as in this case, the defendant celebrated his participation in the riot on social media and demonstrated a lack of candor and honesty in his trial testimony. In *Alford,* the defendant refused to leave the building, and sought to go deeper after being ordered to do so by the police. Similarly, *Vargas* sought to enter the building,

and successfully forced his way in with other rioters, after being physically prevented from doing so by Officer Hallas at the East Rotunda doors.

In *United States v. Jesus Rivera*, 1:21-CR-00060-CKK, the defendant was convicted of the same four misdemeanor offenses as Vargas after a bench trial. The Court imposed 8 months of incarceration, again within the Guidelines range in that case, 12 months of supervised release and $500.00 in restitution. In *Rivera,* the defendant encouraged rioters climbing the walls to the Upper West Terrace, yelling to them that "there's an easier way up!" Similarly, Vargas encouraged other rioters by climbing a wall himself and waiving his hand and a yellow Gadsden flag, in an effort to pump up the chanting crowd, several of whom then engaged in violence against the police line below him on the West Plaza. Also in *Rivera,* the defendant made a concerted effort to go to the front of the mob trying to breach the Senate Wing Door. Similarly, Vargas made his way to the front of the mob at the entrance to the East Rotunda door. After overwhelming the officers guarding that East Rotunda doors, Vargas quickly advanced in the foyer to the front of the mob, up against a second police line, guarding the entrance to the Rotunda, before pushing his way into the Rotunda itself. Also in *Rivera*, as in this case, the defendant did not express any remorse or contrition for his actions.

In *United States v. Lawrence Dropkin,* 1:21-CR-00734 – JEB, the defendant was convicted of the same four misdemeanor charges as Vargas after pleading guilty. The Court imposed 30 days of incarceration, within the Guidelines range of 0 to 6 months in that case, 12 months of supervised release and $500.00 restitution. While the defendant in *Dropkin* was convicted of the same four misdemeanors as Vargas, several factors differentiate the two. For example, in *Dropkin* there was no evidence of a social media presence and prior planning for the riot as with Vargas. There was also no evidence of the lack of remorse Vargas has shown. On the contrary, in *Dropkin*'s pre-

sentence investigation interview the Probation Officer made note of the defendant's expressions of remorse.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.     Restitution.

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A),

"requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*).[2] Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[3] *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). "In view of the purpose of the MVRA and the interpretation of the VWPA's definition of 'victim,' we agree with the Government that it is 'inconceivable that ... Congress somehow meant to exclude the Government as a potential victim under the MVRA when it adopted the definition of 'victim' contained in the VWPA.'" *United States v. Ekanem*, 383 F.3d 40, 44 (2d Cir. 2004).

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance

---

[2] While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement.  *See* 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); *see also United States v. Zerba*, 983 F.3d 983, 986 (8th Cir. 2020); *United States v. Giudice,* 2020 WL 220089, at *5 (D.N.J., Jan. 15, 2020).  The defendant in this case did not enter into a plea agreement.
[3] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[4] *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial

---

[4] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513. Here, the Court should find that Vargas's conduct in entering the Capitol building as part of a mob caused damage to that building.

resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[5]

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), see 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Vargas to pay $500 in restitution for his convictions on Counts One through Four. This amount fairly reflects Vargas's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant

---

[5] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 21 months incarceration, 12 months supervision, a fine of $2,150 to reflect the profits Vargas has earned from his "GiveSendGo" page, and restitution of $500. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior.

<div style="margin-left: 40%;">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

</div>

By:           /s/ *Kyle R. Mirabelli*
              Kyle R. Mirabelli
              Assistant United States Attorney
              NY Bar No. 5663166
              601 D Street, N.W.
              Washington, DC 20530
              (202) 252-7884
              Kyle.Mirabelli@usdoj.gov

              /s/ *Kimberly L. Pascahll*
              Kimberly L. Paschall
              Assistant United States Attorney
              National Security Section
              D.C. Bar No. 1015665
              601 D Street, N.W.,
              Washington, D.C. 20530

## <u>CERTIFICATE OF SERVICE</u>

On this 14 day of March, 2023 a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

By:      /s/ *Kyle R. Mirabelli*
Kyle R. Mirabelli
Assistant United States Attorney
NY Bar No. 5663166
601 D Street, N.W.
Washington, DC 20530
(202) 252-7884
Kyle.Mirabelli@usdoj.gov

*/s/ Kimberly L. Paschall*
Kimberly L. Paschall
Assistant United States Attorney
National Security Section
D.C. Bar No. 1015665
601 D Street, N.W.,
Washington, D.C. 20530