**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00047-RDM** |
| **v.** | : | |
| | : | |
| **HECTOR VARGAS SANTOS,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this supplemental sentencing memorandum in connection with the above-captioned matter.

### <u>*The Base Offense Level for Count Two is 10 under U.S.S.G. § 2A2.4*</u>

The Sentencing Guidelines provide that a defendant convicted of an 18 U.S.C. § 1752 offense is subject to either U.S.S.G. § 2A2.4, which is titled "Obstructing or Impeding Officers," or U.S.S.G.  § 2B2.3, which is entitled "Trespass." *See* U.S.S.G., App. A. If more than one Guidelines provision may apply to a particular offense, the court should "use the guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted." U.S.S.G. § 1B1.2 cmt. n.1. The "most appropriate" of the two potentially applicable guideline provisions is the one that best reflects the "offense conduct charged" in the count of conviction, based on a consideration of the elements of the offense. U.S.S.G. § 1B1.2 cmt. n.1; *accord id.* § 1B1.2(a).

Under this standard, the most appropriate guideline for a Section 1752(a)(2) offense is that found in U.S.S.G. § 2A2.4. Section 1752(a)(2) criminalizes "engag[ing] in disorderly or disruptive conduct" that "in fact, impedes or disrupts the orderly conduct of Government business or official

functions." 18 U.S.C. § 1752(a)(2). As noted above, Section 2A2.4 is entitled "Obstructing or Impeding Officers," a title that parallels Section 1752(a)(2)'s requirement that the defendant have "*in fact*" "impede[d] or disrupt[ed] . . . Government business or official functions" undertaken by government officials. *See* 18 U.S.C. § 1752(a)(2) and U.S.S.G. § 2A2.4.

The contrast with Section 1752(a)(2)'s neighboring provision, Section 1752(a)(1), makes even clearer that Section 2A2.4, not 2B2.3, is the appropriate guidelines provision. Section 1752(a)(1) criminalizes merely "knowingly enter[ing] or remain[ing] in any restricted building or grounds without lawful authority"—functionally, illegal trespass on Capitol grounds. 18 U.S.C. § 1752(a)(1). The most appropriate guidelines provision for that offense is thus plainly Section 2B2.3, which covers "Trespass."[1] But an offense like Section 1752(a)(2), which requires that the defendant both have engaged in disorderly or disruptive conduct *and* in fact have impeded government officials conducting official business, is not captured by a mere "Trespass" guideline. It does, however, correspond closely to an "Obstructing or Impeding Officers" guideline.

Moreover, even if one assumed that Section 2A2.4's "Obstruction" guidelines do not *perfectly* reflect the offense conduct of a Section 1752(a)(2) offense, that does not mean Section 2B2.3 applies. There is no default rule favoring the more lenient guidelines provision. Instead, the only question under the guidelines is which of the two guidelines provisions better captures—even if only slightly better—the offense conduct. And here, a guidelines provision for "Obstructing or Impeding Officers" clearly is *closer* to reflecting the offense conduct (disorderly and disruptive

---

[1] And indeed, the PSRs in cases involving Section 1752(a)(1) offenses appear to have overwhelmingly applied U.S.S.G. § 2B2.3 to that offense. *E.g., United States v. Sidorski*, 21-CR-48-ABJ, Dkt. 45 at 3-4.

conduct that impeded government officials) than a guidelines provision for "Trespass," which does not reflect disorderly or disruptive conduct, or interference with government officials, at all.

Finally, although the "most appropriate" guideline should be determined only by the "offense conduct charged"—that is, the elements of the Section 1752(a)(2) offense—the facts of this particular case also favor application of Section 2A2.4. In this case, there are identifiable officers whose official functions were impeded by Vargas's conduct. The evidence showed that he opened a gate to the West Plaza allowing himself and several other rioters to advance on the overwhelmed Capitol Police Officers guarding that area. *See,* Government Exhibits 102 and 403. The evidence showed he waived a flag on a wall near the southwest plaza and another officer confronted him on that wall, while rioters were fighting with officers nearby on the West Plaza. *See,* Government Exhibits 102, 404, and 508. The evidence showed he tried to enter the Capitol at 3:15 p.m. and was physically prevented from doing so by Officer Michael Hallas who was striving to keep rioters out of the building. *See,* Government Exhibit 103. The evidence also showed he made his way to the front of the crowd, inside the foyer, and pushed his way through a police line and into the Grand Rotunda. *See,* Government Exhibits 104, 415, 302 and 305.

It appears that in several other PSRs in separate cases, the Probation Office has agreed with the United States that Section 2A2.4 and its base offense level of 10 is the appropriate guideline for the Section 1752(a)(2) offense. *E.g., United States v. Eric Cramer,* No. 22-CR-339-RDM, Dkt. 55 at 13 (Sentencing memorandum setting forth PSR calculations); *United States v. Rubenacker*, No. 21-CR-193-BAH, Dkt. 52 at ¶ 46; *United States v. Simon*, No. 21-CR-346-BAH, Dkt. 59 at 20 (Sentencing memorandum setting forth PSR calculation); *United States v. Bromley*, No. 21-CR-250-PLF, Dkt. 48 at ¶ 45; *United States v. LaRocca, et al.*, 21-CR-317-TSC, Tr. 8/10/22 at 19; *United States v. Matthew Baggott,* 21-CR-411-APM, Dkt. 67 at 17-18 (Sentencing memorandum

3

setting forth PSR calculations); *United States v. Sidorski*, 21-CR-48-ABJ, Dkt. 42 at 19-20 (Sentencing memorandum setting forth PSR calculations); *United States v. Stephen Ayres,* 21-CR-156-JDB, Dkt. 61 at 6-7 (Sentencing memorandum setting forth PSR calculations). It likewise appears that judges have applied Section 2A2.4 in those cases: this Court in *Cramer;* Judge Howell in *Rubenacker* and *Simon*, Judge Friedman in *Bromley*, Judge Chutkan in *LaRocca*; Judge Berman Jackson in *Sidorski* (though Judge Berman Jackson applied it because the parties agreed to it and the case involved obstruction of a law enforcement officer; Judge Berman Jackson otherwise declined to agree with the government's argument in favor of Section 2A2.4); Judge Mehta in *Baggott*; and Judge Bates in *Ayres*.

Because the appropriate guidelines provision is determined based on the elements of the Section 1752(a)(2) offense, not a rioter's particular conduct, the U.S. Probation Office's application of Section 2A2.4 in these cases would logically indicate it applies here as well.

Overwhelmingly, probation and the Court has applied Section 2A2.4 for convictions under Section 1752(a)(2), with one exception being *United States v. Brodnax*, 21-cr-00350-PLF. In that case, the Court rejected the government's argument that a conviction under 18 U.S.C. § 1752(a)(2) necessarily triggers application of U.S.S.G. § 2A2.4 (obstructing officers) and concluded that the appropriate Guideline is U.S.S.G. § 2B2.3 (trespass).

The Court in *Brodnax* acknowledged that no case law directly addressed the appropriate Guideline and drew support for its conclusion from two cases: *United States v. Montez*, 36 F.4th 824 (8th Cir. 2022) and *United States v. Duran*, 891 F. Supp. 629 (D.D.C. 1995). In *Montez,* the Eighth Circuit held that U.S.S.G. § 2A2.4 is the most analogous Guideline for a violation of 18 U.S.C. § 231(a)(3). *Montez* at 827. In *Duran*, the district court concluded that U.S.S.G. § 2A2.4—and not U.S.S.G. § 2A2.2 (aggravated assault)—was the appropriate Guideline for a violation of

18 U.S.C. § 111(a) and (b) because the defendant's conduct in that case did not involve a deliberate attempt to harm a Secret Service agent. *Duran* at 634. The Court in *Brodnax* noted that the offenses in question specified obstruction of individual officers as opposed to government business as a whole, and in contrast, Section 1752(a)(2) involves disrupting the "orderly conduct of government business or official functions," not a specified person.

Neither *Montanez* nor *Duran* supports the conclusion that Section 2B2.3 is the appropriate guideline. Although Section 1752(a)(2) does not use the word "officer" or "person" in its statutory text, it is not possible to violate that provision without obstructing or impeding an officer. Section 1752(a)(2) requires not only that the defendant knowingly engaged in "disorderly or disruptive conduct" with "intent to impede or disrupt" government business or official functions, but also that the defendant's conduct "in fact" impedes or disrupts the government business or official functions. Government officers carrying out such government business or official functions must therefore have been "impede[d]" or "disrupt[ed]" for the defendant to have violated Section 1752(a)(2). The Eighth Circuit in *Montanez* surveyed other statutes for which Section 2A2.4 is the applicable Guideline, noting that those other statutes involved acts such as "obstructing" or "impeding"—i.e., the same basic *actus reus* covered in Section 1752(a)(2). *See Montanez*, 36 F.4th at 826 (considering 18 U.S.C. §§ 1501, 1502, and 3056(d)).

In disagreeing with that argument, the Court in *Brodnax* suggested that a person could engage in disorderly conduct from a gallery in Congress or briefly in a courtroom that has only a *de minimis* effect on the government business or official function. This hypo assumed "the business can go on" because the individual in question would be "promptly removed." Yet it's by no means clear that such a person would have actually violated Section 1752(a)(2) if the facts do not establish that the individual in question "in fact" disrupted or impeded—as opposed to

momentarily interrupted—the government business or official conduct at hand.  Relatedly, the Court emphasized that the defendant in *Brodnax* made no "physical contact" with officers.  However, there is a separate enhancement that applies when a defendant makes physical contact, *see* U.S.S.G. § 2A2.4(b)(1)(A), which suggests that physical contact is not a requirement to trigger the Guideline in the first instance.

The Court in *Brodnax* also pointed to two of U.S.S.G. § 2A2.4's application notes.  First, the Court reasoned that Application Note 2's reference to a "victim" suggests U.S.S.G. § 2A2.4 is a poor fit for Section 1752(a)(2), which targets government business.  The government respectfully disagrees with this reasoning as government business is necessarily carried out by government officials—here members of Congress—and the fact that Congress is the victim for grouping purposes is not inconsistent with that view because Congress, of course, ultimately consists of lawmakers, *i.e.*, actual people.

Second, the Court viewed Application Note 3, which provides (1) that the "base offense level does not assume any significant level disruption of government functions" and (2) that a significant disruption could warrant an upward departure, as "somewhat relevant."  But that note would tend to favor the view that U.S.S.G. § 2A2.4 *is* the appropriate Guideline for Section 1752(a)(2).  For one, it undermines the Court's *de minimis* hypo examples.  Moreover, it uses similar terminology as that found in Section 1752(a)(2)—"disruption of government functions."  That language implicitly recognizes that disrupting government functions, which involves disrupting the officers carrying out those functions, falls within the scope of U.S.S.G. § 2A2.4.  And that conduct is precisely what Section 1752(a)(2) criminalizes.

## *Vargas's Crimes Involved Physical Contact*

Under U.S.S.G. § 2A2.4, the offense level is increased 3 levels if "the offense involved physical contact." Physical contact is not defined in the Guidelines. *Cf.* U.S.S.G. § 1B1.1, cmt., n.1 (defining "bodily injury" and "serious bodily injury"). The wording of the enhancement supports a reading that direct physical contact between the defendant and an officer is not required. The broader formulation, "the offense involved physical contact" would accommodate the indirect use of force, whereas "the defendant made physical contact with an officer" might not.

Several cases have applied the Section 2A2.4(b)(1) enhancement when the defendant did not make direct physical contact with an officer. Those cases did not involve groups of people pushing against the police but support application of the enhancement for those who throw objects at the victims. *E.g., United States v. Taliaferro*, 211 F.3d 412, 415-16 (7th Cir. 2000) (enhancement properly applied where inmate threw a cup of urine into a prison guard's face); *United States v. Shelton*, 431 F. Supp. 2d 675, 675-77 (E.D. Tex. 2006) (defendant threw a cup containing feces and urine at a prison guard, which struck his head, face, and chest), *aff'd*, 230 F. App'x 457 (5th Cir. 2007). One court held that the enhancement applied to a defendant who worked in concert with a codefendant who made indirect contact with the victim. *United States v. Beltran-Higuera*, 642 F. App'x 780, 782–84 (9th Cir. 2016) (enhancement properly applied where defendant manned the fuel lines of a ship that fled from the Coast Guard for several hours, even after he saw the codefendant ship captain violently resist an order to "heave to" and then ram the USCG vessel; "the district court did not clearly err in finding that [defendant] could reasonably foresee that his actions could bring about further physical contact between [codefendant] and the officers").

In *Taliaferro*, the Court explained that although no federal court has defined "physical contact" as used in Section 2A2.4(b)(1), the meaning can be derived by examining the law of

battery. While battery is defined as "intentional and wrongful physical contact with a person," *see* BLACK'S LAW DICTIONARY 152 (6th ed. 1990), it is clear that the contact between the aggressor and the victim need not be direct, but rather can result from the "indirect application of force ... by some substance or agency placed in motion by" the aggressor. 211 F.3d at 415-16 (citing cases holding that "spitting on another person has long been held to constitute a battery").

It is clear that Vargas forced his way to the front of the crowd and used his body weight and arms to press up against the backs and bodies of other rioters. *See* Government Exhibits 104, 415 and 905.  Directly in front and to the right of Vargas, rioters pushed against the police lines. *See* Government Exhibit 415. By 3:23:25 p.m., Vargas was close to the police line guarding the Rotunda entrance and pushed with the crowd against that line. *See* Government Exhibit 104. In the surveillance video in Government Exhibit 104, at approximately 3:22:50, Vargas was right up against the police line with a crowd of rioters that swayed back and forth as they seemingly pressed and pushed against the officers blocking the entrance to the Rotunda. *See* Government Exhibit 104.

Around that same time, body-worn camera footage in Government Exhibit 307 shows officers inside the Rotunda as they tried to push against the rioters' opposing force. At 3:22:49, an officer yelled, "They're pushing back in!" Another officer yelled at 3:23:18, "Come on guys, push!" Government Exhibit 105 shows the density of the police around the entrance that Vargas and the other rioters pushed into. By approximately 3:24:30, Vargas and a small group of rioters broke through the police line. *See* Government Exhibits 302, 305, and 306. Government Exhibit 305 at 3:24:30, shows Vargas pressing his back into another rioter, whom an officer is trying to control, demonstrating the force being used by the rioters – and Vargas specifically – which

overwhelmed the police line and made it possible for Vargas to move further into the restricted Capitol building.

In the context of January 6, 2021 cases, in *United States v. Geoffrey Shough,* 22-cr-00197-DLF, the Court applied the three-level enhancement under U.S.S.G. § 2A2.4(b)(1)(A). *Shough* shares many factual similarities to Vargas' conduct. Like Vargas, the defendant in that case drove from his home state to attend the "Stop the Steal Rally" and wore tactical gear to the Capitol grounds. *See* Government Sentencing Memorandum, Dkt. 33 at 6. He also assisted other rioters onto a small wall near the Northwest steps, similar to Vargas' attempt to help another rioter onto the wall on the southwest plaza. *Id.* In *Shough,* the defendant entered the Capitol "through the Senate Wing Door, . . . [and he], or other rioters acting in concert with him, made physical contact with the line of USCP Officers who were defending the Capitol Building." *Id.* at 13. Similarly, Vargas and other rioters, made physical contact with the line of officers guarding the entrance to the Rotunda – a line Vargas ultimately penetrated. Vargas used his forearms and hands to push and apply pressure to the backs of rioters in front of him, maneuvered to the front of the crowd and pushed his bodyweight against the officers. In *Shough,* the defendant was convicted of 18 U.S.C. § 231(a)(3) pursuant to a plea agreement and the physical contact enhancement was applied by the Court pursuant to that agreement.

### ***Vargas' Trial Testimony***

Vargas testified during trial and made several false and misleading statements.

- Vargas testified that he wore his tactical vest over his jacket because of the cold. Trial Tr. 12/08/2022 at 186. However, earlier in Vargas's testimony he presented photographs of himself wearing the tactical vest at "Black Lives Matter" protests in the summer of 2020. Trial Tr. 12/08/2022 at 177-181. Potentially realizing this error, Vargas goes on to explain that the tactical vest "for -- it's almost -- for me, almost a part of certain outfits I wear." Trial Tr. 12/08/2022 at 186.

- Vargas attempted to give the jury the impression that he was a peaceful community activist, who attended a lot of political and social rallies and introduced photographs of himself attending "Black Lives Matter" protests. Trial Tr. 12/08/2022 at 177-182. During his testimony, Vargas stated he attended those rallies to protest police brutality and the death of George Floyd. Trial Tr. 12/08/2022 at 179-180. The Court stated that Vargas "sort of gave the jury the impression that he's a strong supporter of Black Lives Matter." Trial Tr. 12/09/2022 at 41. In its rebuttal case, the government introduced numerous social media messages in which Vargas expressed his disdain for "Black Lives Matter" and in which he even hatched a plan to paint over the Black Lives Matter mural on Pennsylvania Avenue. Trial Tr. 12/09/2022 at 63-70.

- Vargas was evasive when he testified that he was not heading anywhere in particular after the speech at the Ellipse but happened to travel in the direction of the Capitol. Trial Tr. 12/08/2022 at 185. Earlier in his testimony he stated that as soon as then President Trump stated to march to the Capitol, he wanted to be the first person there. Trial Tr. 12/08/2022 at 185.

- Vargas testified that after Officer Michael Hallas stopped him in the entryway to the East Rotunda doors, he tried to avoid entering the building. Trial Tr. 12/08/2022 at 205-210; Trial Tr. 12/09/2022 at 16-19. However, the surveillance video in Government Exhibit 103 shows rioters streaming out of the Capitol and moving away from the East Rotunda doors for several minutes after Vargas first attempted to enter. Vargas did not follow this crowd away from the East Rotunda doors. Instead, Vargas remained near the entryway, off to one side for several minutes until the crowd gained momentum at around 3:20 p.m.

- Vargas was disingenuous when he explained that he remained in the entryway of the Capitol for several minutes – not because he desired to enter the building – rather, because of his great admiration for the Capitol and its architecture. 12/09/2022 at 18. However, the evidence showed that minutes later Vargas filmed himself in the Rotunda as he referred to the Capitol as a "motherfucker" he "took over."

- Vargas testified that his hand and arm movement by the East Rotunda doors demonstrated him trying to hold onto the door to prevent himself from being pushed into the building with the crowd. Trial Tr. 12/08/2022 at 205-210; Trial Tr. 12/09/2022 at 16-19. The video evidence introduced at trial and discussed above showed him briefly holding onto the door as he maneuvered his body into the entryway. Vargas was not clinging to the door to prevent from being pushed into the building. Vargas used his hands and forearms to maneuver around, and press open, the East Rotunda door. Vargas' testimony is also in contrast to his stated

intent. Vargas messaged another person on social media at approximately 2:50 p.m. and stated "we're about to go in." *See* Government Exhibit 702.

- Vargas testified that it was impossible for him to turn around in the foyer and that he continued to be pushed into the rotunda. Trial Tr. 12/09/2022 at 22, 31-32. Vargas testified that he "tried to force from going forward many times, but the people just kept pushing behind me. Trial Tr. 12/09/2022 at 23. The video shows that Vargas continued moving forward through the crowd and into the Rotunda. *See* Government Exhibits 104, 302-308, 414-415, 504. As the Court mentioned at the hearing on March 7, 2023, Vargas appeared to work his way to the front of the crowd, using his arms to position himself in front of others to get into the Rotunda.

- Another example of Vargas' disingenuous testimony was when he described being under the effects of pepper spray from the time he entered the foyer area outside the rotunda and those effects continuing as he entered the rotunda. Trial Tr. 12/09/2022 at 22. In Officer Lepe's body worn camera footage Vargas did not appear to be coughing. Government Exhibit 306. Further, as seen in Government Exhibits 104, 303, 701.2, and 906 approximately 2 minutes and 30 seconds passed from when Vargas was in the foyer, up against the police line and from when Vargas began recording a "selfie" video of himself inside the rotunda. In the video, it is clear that Vargas is not under the effects of pepper spray and appears rather calm when he proclaims that he "took over" the Capitol.  Government Exhibit 701.2.

- Vargas testified that he asked police for the way out of the Rotunda. Trial Tr. 12/09/2022 at 54. This is not supported by any evidence despite numerous officers wearing body worn cameras at the time he entered.

### *Grouping*

Under U.S.S.G. § 3D1.2, "closely related counts" group under several circumstances. First under Section 3D1.2(a) counts group when they involve the same victim and the same act or transaction. Second, under Section 3D1.2(b) counts group when they involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan. For grouping purposes, "the term 'victim' is not intended to include indirect or secondary victims . . . [it is intended to capture] who is directly and most seriously affected by the offense. U.S.S.G. § 3D1.2, app. note 2. Here that is Congress.

Under Sections 3D1.2 (a) and (b), Counts One and Two Group because Congress was the victim of both counts and Vargas' conduct included several actions that were part of a common criminal objective, scheme or plan. The gravamen of Section 1752(a)(2) is impeding or disrupting "the orderly conduct of Government business or official functions." Although it's true that actions of the police officers who were protecting the Capitol on January 6, 2021 was "government business" or a governmental function, that was ancillary to the paramount "business or function" taking place on that day: the certification vote, which was being conducted only by Congress.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:        /s/ *Kyle R. Mirabelli*
Kyle R. Mirabelli
Assistant United States Attorney
NY Bar No. 5663166
601 D Street, N.W.
Washington, DC 20530
(202) 252-7884
Kyle.Mirabelli@usdoj.gov

*/s/ Kimberly L. Pascahll*
Kimberly L. Paschall
Assistant United States Attorney
National Security Section
D.C. Bar No. 1015665
601 D Street, N.W.,
Washington, D.C. 20530

## <u>CERTIFICATE OF SERVICE</u>

On this 20th day of March, 2023 a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

By:    <u>/s/ *Kyle R. Mirabelli*</u>
Kyle R. Mirabelli
Assistant United States Attorney
NY Bar No. 5663166
601 D Street, N.W.
Washington, DC 20530
(202) 252-7884
Kyle.Mirabelli@usdoj.gov

<u>/s/ *Kimberly L. Paschall*</u>
Kimberly L. Paschall
Assistant United States Attorney
National Security Section
D.C. Bar No. 1015665
601 D Street, N.W.,
Washington, D.C. 20530