## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Criminal Action No. 21-47 (RDM) |
| HECTOR EMMANUEL VARGAS SANTOS, | |
| *Defendant*. | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Hector Emmanuel Vargas Santos's motion for refund of fines and restitution and for return of property. Dkt. 105. The government does not oppose the motion. Dkt. 107. Nonetheless, for the reasons explained below, the Court will deny Defendant's motion.

## I.    BACKGROUND

On January 6, 2021, Vargas participated in the riot at the United States Capitol. Vargas was one of thousands who descended upon the Capitol that day, but he was one of the first individuals to breach the restricted Capitol grounds. After remaining on those restricted grounds for several hours, Vargas forced his way into the Capitol building and Rotunda with a crowd of rioters. Vargas and his fellow rioters caused substantial physical damage to the Capitol, requiring the expenditure of more than $2.8 million for repairs. Dkt. 81 at 5–6; Dkt. 44 at 13.

Based on this conduct, the United States charged Vargas with four counts: (1) Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); (2) Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2); (3) Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C.

§ 5104(e)(2)(D); and (4) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). *See* Dkt. 3 (Information). Following a jury trial, Vargas was convicted by a unanimous jury on all counts. Dkt. 64 (Verdict Form). At sentencing, the Court concluded that the Guidelines Range was six to twelve months, but the Court varied downward and imposed a sentence of four months of incarceration to be followed by twelve months of supervised release. *See* Dkt. 88 (Judgment); Sentencing Tr. (Rough at 37, 67–68). The Court also ordered Vargas Santos to pay a $70 mandatory special assessment, $500 in restitution to the Clerk of the Court for disbursement to the Architect of the Capitol, and $2,500 as a fine. Dkt. 88 at 6–7.

Vargas timely appealed, Dkt. 90, but while his appeal was pending, President Trump granted pardons to "to all . . . individuals convicted of offenses related to events that occurred at or near the United States Capitol on January 6, 2021," Proclamation No. 10887, 90 Fed. Reg. 8331, 8331 (Jan. 29, 2025); *see* Dkt. 110 at 1, 4.[1] In light of Vargas's pardon, the government filed a motion in the Court of Appeals to vacate Vargas's convictions and for remand to dismiss the case as moot, which that court granted. Dkt. 104-1 at 1. This Court, accordingly, dismissed the case as moot. Min. Order (Feb. 4, 2025).

---

[1] At one point in his motion, Vargas appears to indicate that he did not receive a pardon, *see* Dkt. 105 at 2, but the government maintains that Vargas did receive a pardon, *see* Dkt. 110 at 4; Apr. 22, 2025 Hrg. Tr. (Rough at 6). The text of the Proclamation supports the government's view. Vargas was "convicted" in the district court "of offenses related to events that occurred at or near the United States Capitol on January 6, 2021." Proclamation No. 10887, 90 Fed. Reg. 8331, 8331 (Jan. 29, 2025). Vargas's posture, moreover, stands in contrast with defendants who had not yet been convicted, but were subject to "pending indictments" related to January 6. *Id.* Those individuals did not receive a pardon; instead, the Proclamation directed the Attorney General to "pursue dismissal with prejudice" of the pending indictments. *Id.* The government's understanding is also reinforced by the fact that another defendant who was in an identical procedural posture as Vargas—that is, his conviction was on appeal at the time of the pardons— was issued a "Certificate of Pardon" by President Trump. *See United States v. Cua*, No. 21-cr-107, Dkt. 397-1.

Before receiving his pardon, Vargas paid the $70 special assessment, $500 in restitution, and $1,456.19 towards his $2,500 fine, for a total of $2,026.19. Dkt. 105 at 1–2. In accordance with its usual protocol, the Finance Office for the District Court collected these funds and deposited them into the Crime Victims Restitution Fund within the United States Treasury. Dkt. 110 at 3; *see also* 34 U.S.C. § 20101. After the Court dismissed his case, Vargas submitted a request to the Finance Office for a refund of his payments, but the Office responded that it was unable to issue a refund. Dkt. 105 at 2. Relying on *Knote v. United States*, 95 U.S. 149 (1877), the Finance Office explained that "[c]riminal debt, which includes special penalty assessments, fines, and restitution, paid to the U.S. Government . . . pursuant to a valid Judgment in a Criminal Case Order and prior to a pardon or dismissal is considered to be vested in a third party and therefore not available to be refunded." Dkt. 105-3 at 1.

This led Vargas to file the instant motion for an order requiring a refund of his payments.[2] The government filed a response, stating that it agrees that Vargas's payments should be refunded, Dkt. 107, but that the parties nonetheless require an order from the Court in order to effectuate their return, Apr. 22, 2025 Hrg. Tr. (Rough at 3). At the Court's request, the government filed a supplemental brief. Dkt. 110.[3] Vargas's motion is now ripe for decision.

---

[2] Vargas also seeks return of his personal property, which the government is in the process of returning to him. Dkt. 110 at 1 n.1.

[3] The Court requested supplemental briefing regarding its jurisdiction to adjudicate the motion, among other things. Consistent with its "independent obligation to assure [itself] of [its] jurisdiction," *Sierra Club v. U.S. Dep't of Transp.*, 125 F.4th 1170, 1179 (D.C. Cir. 2025), the Court concludes that it has ancillary jurisdiction over Vargas's motion, *see United States v. Wilson*, 540 F.2d 1100, 1103–04 (D.C. Cir. 1976) (holding that district court had ancillary jurisdiction over criminal defendant's motion for return of seized property following his sentencing). The Court is also satisfied that, notwithstanding the parties' apparent lack of adversity, the motion presents a justiciable "case or controversy." *United States v. Windsor*, 570 U.S. 744, 758 (2013). A request for an order requiring "the United States to pay money that it would not disburse but for the court's order" presents an Article III "controversy," even where

## II.  ANALYSIS

Vargas and the government's principal contention is that the Finance Office was wrong to rely on *Knote v. United States*, 95 U.S. 149 (1877), when it denied Vargas's request for a refund.  The parties urge that Vargas's motion is, instead, governed by *Nelson v. Colorado*, 581 U.S. 128 (2017).  According to the parties, *Nelson* stands for the broad proposition that "when a defendant's conviction is vacated on appeal, the defendant is entitled to a return of fines, fees, and restitution."  Dkt. 110 at 1.  Vargas's motion thus raises the question of whether *Knote* or *Nelson* controls.

Like the present case, *Knote v. United States* arose from the issuance of a presidential pardon.  The petitioner in *Knote* was a Confederate supporter, and, following the Civil War, the United States confiscated and sold Knote's property "on the alleged ground of his treason and rebellion."  *Knote*, 95 U.S. at 149.  The United States did so pursuant to the Confiscation Act of 1862, which authorized the government to "seize" the property of "any person . . . aiding or abetting [the] rebellion."  *See* Confiscation Act of July 17, 1862, § 6, 12 Stat. 589.  The proceeds of that sale—totaling $11,000 at the time or over $200,000 if adjusted to current purchasing power—were then "paid into the treasury."  *Knote*, 95 U.S. at 149.  After President Johnson granted a blanket pardon "to all persons who had directly or indirectly participated in the rebellion," Knote filed suit in the Court of Claims seeking the proceeds from the sale, but the court dismissed his case.  *Id.* at 149–50, 152.  The Supreme Court thus considered "whether the general pardon and amnesty granted by President Johnson" "entitle[d]" pardoned individuals "to

---

the United States would "welcome" such an order because it agrees with the ruling.  *Id.*  Here, the United States has indicated that it requires a Court order to effectuate the payment and that it cannot act unilaterally.

the proceeds of [their] property, previously condemned and sold . . . after such proceeds have been paid into the treasury." *Id.* at 152.  The Court concluded that it did not.

The Court began with the "settled" principle that a pardon "releases the offender from all disabilities imposed by the offence, and restores to him all his civil rights," but a pardon does not "affect any rights which have vested in others directly by the execution of the judgment for the offence." *Id.* at 153–54.  If, for example, a defendant's property is seized and sold to a third party pursuant to a valid judgment, that third party gains a vested property right and "will hold the property notwithstanding the subsequent pardon." *Id.* at 154.  The Court applied this principle to the United States, concluding that "if the proceeds have been paid into the treasury, the right to them has so far become vested in the United States that they can only be secured to the former owner of the property through an act of Congress." *Id.*  The Appropriations Clause prohibits drawing money from the Treasury except "in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.  The Court noted, however, that this rule does not apply where proceeds have not yet been deposited into the U.S. Treasury, but "remain under control of the Executive" or "are in the custody of the judicial tribunals." *Knote*, 95 U.S. at 154.  In those circumstances, "the property will be restored or its proceeds delivered to the original owner, upon his full pardon." *Id.*  But because Knote's proceeds *had* been paid into the Treasury, and because no appropriations law authorized their return, the funds could not be "subsequently reached and recovered by the offender"—Knote's pardon notwithstanding. *Id.*  The Court, accordingly, concluded that "[h]owever large . . . may be the power of pardon possessed by the President," it "cannot touch moneys in the treasury of the United States, except expressly authorized by act of Congress," in accordance with the Appropriations Clause. *Id.*

*Nelson v. Colorado*, 581 U.S. 128 (2017), in contrast, did not involve the issuance of a pardon.  In *Nelson*, the Court addressed whether the Fourteenth Amendment's Due Process Clause requires states to refund payments exacted from criminal defendants and deposited into state coffers after a court invalidates the underlying conviction.  *Id.* at 130.  The petitioners there were each convicted at trial in Colorado state court and ordered to pay fees and restitution, which were deposited into Colorado's "victim compensation fund" and its "victims and witnesses assistance and law enforcement fund," pursuant to state law.  *Id.* at 131 nn.1–2.  The petitioners' convictions were subsequently vacated, and the petitioners, accordingly, moved for return of their payments.  *Id.* at 131–32.  Colorado law, however, permitted refunds in such circumstances only if defendants could "show, by clear and convincing evidence, [their] actual innocence of the offense of conviction."  *Id.* at 132–34.  The U.S. Supreme Court held that Colorado's refund law violated due process, reasoning that Colorado had "no legal right to . . . retain" funds exacted from a defendant whose conviction had been vacated, *id.* at 132, 139, and by requiring defendants to prove their innocence, the law created an unacceptable "risk of erroneous deprivation" of defendants' property, *id.* at 137.

The Court is unpersuaded that *Nelson* applies in the present context.  *Nelson* had nothing to do with the scope of the pardon power or the Appropriations Clause.  Rather, it held that vacatur of a conviction presumptively entitles a defendant to a refund of her payments into the state's coffers, and so "a State may not impose anything more than minimal procedures" on obtaining that refund.  *Nelson*, 581 U.S. at 139.  The vacatur of a conviction for reasons other than a pardon generally renders the conviction void *ab initio*.  The parties insist that *Nelson* governs here because, like the petitioners in that case, Vargas's conviction was also subsequently vacated.  It is true that Vargas's conviction was vacated, but that alone does not trigger *Nelson*'s

rule.  The Court's power to order a refund does not turn on whether a defendant's conviction was vacated or not; it turns on whether the defendant is *entitled* to funds that were deposited into the U.S. Treasury before the pardon was granted.  As *Knote* made clear, a pardoned individual is not "entitle[d]" to payments that have already been deposited into the United States Treasury, absent congressional authorization to withdraw the funds.  *Knote*, 95 U.S. at 152; *see also In re North*, 62 F.3d 1434, 1435 (D.C. Cir. 1994) ("[The Appropriations Clause] is a restriction on the power of the President to grant pardons.").

Notably, the statute at issue in *Knote* did not require a criminal conviction at all, and there is no indication that Knote himself was ever convicted of treason.  *See Knote*, 95 U.S. at 149–52; *see also Knote v. United States*, 10 Ct. Cl. 397, 398 (1874); Confiscation Act of July 17, 1862, § 6, 12 Stat. 589.  If individuals who were never convicted of a crime are not entitled to a return of their property following a pardon, then it stands to reason that the same rule applies to individuals whose convictions were vacated, not because their convictions were invalid, but because they received presidential pardons.  And, like the petitioner in *Knote*, Vargas's payments have left the custody of the executive and judicial branches and have been deposited into the U.S. Treasury.  Dkt. 108-1 at 3.  Thus, at least for purposes of evaluating the Court's authority to order their return—that is, for purposes of deciding whether the Court has the power to order the United States to withdraw funds from the Treasury to make a payment to Vargas—they are treated as "vested in the United States," *Knote*, 95 U.S. at 154 ("if the proceeds have been paid into the treasury, the right to them has so far become vested in the United States that they can only be secured to the former owner of the property through an act of Congress").  The Court, accordingly, concludes that because Vargas's conviction was set aside by virtue of the

presidential pardon, and because the funds "have been paid into the treasury," *Knote* applies, rather than *Nelson*.  And under *Knote*, the Court must deny Vargas's motion.

The government makes two arguments in the alternative, but neither is persuasive.  The government first insists that, even if *Knote* applies, the Court may nonetheless order a refund because the Architect of the Capitol is the intended recipient of Vargas's restitution payments.  Dkt. 110 at 2 n.2.  The government reasons that because the Architect is a "governmental entity," not a "third-party victim," the United States does not have a vested right to the funds.  *Id.*  But under *Knote*, the question is not whether the intended recipient is a "governmental entity."  The only question is whether the funds remain in the custody of an executive agency or the court system, or whether they have been deposited into the U.S. Treasury.  As explained above, Vargas's funds have now been deposited into the Treasury, and so the Court is unable to order their return.

The government next avers that it has identified an appropriations law that authorizes the return of Vargas's funds.  According to the government, "the general appropriation act for the Department of Treasury," 31 U.S.C. § 1322, allows it to refund an "erroneous deposit of money into the United States Treasury."  Dkt. 110 at 3–4.  That statute provides, in relevant part:

(b)  Except as provided in subsection (c) of this section, necessary amounts are appropriated to the Secretary of the Treasury to make payments from

. . . .

(2)  the United States Government account "Refund of Moneys Erroneously Received and Covered" and other collections erroneously deposited that are not properly chargeable to another appropriation.

31 U.S.C. § 1322(b).  The government asserts that, "if the Court enters an order directing that the fees and restitution be paid to the defendant in this matter, because his conviction was vacated,

the Clerk of Court would be authorized . . . to disburse those funds from the designated account." Dkt. 110 at 4.

The government misreads § 1322(b).  The text permits refunds for "collections erroneously deposited," but that does not describe Vargas's payments.  As the Supreme Court explained in *Knote*, a pardon does not make one's conviction or exaction "erroneous" in the first place.  Rather, once a conviction has been "established by judicial proceedings," any penalties imposed are "presumed to have been rightfully done and justly suffered," regardless of whether the defendant later receives a pardon.  *Knote*, 95 U.S. at 154.  Because Vargas's payments were collected while his convictions were "in force," *id.*, the funds were not "erroneously collected" and are therefore not refundable from this account.

## CONCLUSION

For the reasons explained above, Vargas's motion for refund of fines and restitution and for return of property, Dkt. 105, is **DENIED**.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  June 27, 2025